Argued March 17, decided April 28, rehearing denied July 14, 1908.

## RUSH v. OREGON POWER CO.

[95 Pac. 193.]

MASTER AND SERVANT—INJURY TO SERVANT—ACTIONS—EVIDENCE.

1. The complaint in an action for injuries to a brakeman while uncoupling cars, which alleges negligence in placing in thet rain without inspection, cars on which there were defective brakes, is not supported by evidence of the mere happening of the accident.

SAME—DUTY OF MASTER TO FURNISH SAFE APPLIANCES.

2. An employer must exercise diligence to furnish to its employees reasonably safe appliances, and, in the absence of any notice thereof, the employee may assume that the duty has been discharged.

SAME.

3. A railroad company must keep its appliances in safe condition, and must cause as frequent and thorough inspection of its instrumentalities as can be done consistently with the conduct of its business, for the purpose of discovering defects that may occur from accidental causes or wear or decay.

SAME.

4. In an action for injuries to a brakeman while uncoupling cars, the evidence showed that the coupling of a car was defective because the chain thereof was too short, that the chain had been repaired, and that the mending of it had made it too short. The day before the injury the car with the defective chain was brought into the yard where inspection was expected to be made. *Held*, that the railroad had notice of the defect, since the defect was patent and discoverable by the exercise of ordinary diligence.

SAME—CONTRIBUTORY NEGLIGENCE.

5. Whether a brakeman injured while uncoupling cars was guilty of contributory negligence, *held*, under the evidence, for the jury.

SAME.

6. A servant who unnecessarily adopts a dangerous method of performing the labor required of him, generally assumes the resulting danger, but his choice of a customary method of doing the work is not ordinarily negligence.

SAME—NONSUIT—WHEN AUTHORIZED.

7. Where in an action for injuries to a brakeman while uncoupling cars, the jury could have found that a chain attached to a coupler was too short and insufficient; that, if the railroad had exercised reasonable care in inspecting the chain after it had been repaired, the defect would have been discovered; that the injuries could reasonably have been forseen or guarded against; and that the brakeman had no knowledge of the imperfection—it was error to grant a nonsuit.

From Multnomah: Calvin U. Gantenbein, Judge.

Statement by Mr. Justice Moore.

This is a suit by Mark Rush against the Oregon Water Power & Ry. Co., a corporation, to recover damages for a personal injury suffered by the plaintiff while engaged as a brakeman in the employ of the defendant. The negligence stated in the complaint is the failure of the defendant to inspect two freight cars, the brakes of which, it is alleged, were out of order and so defective that they would not hold when the cars were loaded, and also the heedless putting into a train, without examination, other cars on which were defective couplings, with short and inadequate chain connections, which imperfections were known to the defendant, or, by the exercise of reasonable care on its part, might have been known by it, but to the plaintiff were unknown, who, in attempting to uncouple the latter cars January 29, 1906, lost his right arm, particularly setting forth the facts and circumstances whereby the injury was sustained.

The answer denies the negligence alleged, and avers that the hurt of which the plaintiff complains, resulted from his own negligence and that of a fellow workman, and also that the plaintiff assumed the risk. The reply put in issue the allegations of new matter in the answer, and, the cause coming on for trial, a nonsuit was given on motion of the defendant, when the plaintiff had introduced his evidence and rested. From this judgment, he appeals.                                    Reversed.

For appellant there was a brief over the names of *Long & Sweek* and *Spencer, Davis & Farrell,* with an oral argument by *Mr. Joel M. Long.*

For respondent there was a brief over the names of *Hogue & Wilbur* and *Mr. Dan J. Malarkey,* with an oral argument by *Mr. Ralph W. Wilbur.*

Mr. Justice Moore delivered the opinion of the court.

It is contended by plaintiff's counsel that an error was committed in granting the nonsuit. The consideration

of this question necessitates an examination of the testimony relating to the place, cause, and circumstances attending the injury. It appears that the defendant owns a standard-gauge railroad which is built from Portland to other places, and operates on its lines by electricity, cars for transporting passengers and freight, and maintains in such city a power house, to which extends from its main line a spur, and that other side tracks form at that place a yard where motors and cars are inspected. The plaintiff is an experienced brakeman, and at the time of his injury was employed as such by the defendant. The head brakeman, or conductor, as he is sometimes called, who was employed to switch cars in the Portland yard, did not report for duty January 29, 1906, whereupon the yardmaster ordered the plaintiff to perform that service, and directed him to go with a motor to the power house and remove therefrom some empty cars, and to place therein two cars loaded with cordwood. At the place indicated the main track of the railroad extends nearly south, and a side track branches to the west. The loaded cars were "kicked" back on the main line south of the switch, where they were left in charge of a person who set the brakes to hold them in position. The plaintiff, having removed from the power house five empty flat cars forming a train which was coupled at the north end to the motor, was passing over the switch that connects the main line and the side track, when the loaded cars, notwithstanding the friction of their brakes, rolled north, and the corner of the forward car struck the third empty car from the motor at a point about four feet south of its coupling, causing the latter car to be slightly lifted from the track on the side where the collision occurred. The plaintiff, desiring to clear the track for a passenger car that was about due, went to the west side of the second car from the motor to uncouple that car, intending to move the disengaged part of the train to the north, so as to place a pole against it and the cor-

ner of the loaded car, which he expected to force back on the main line, and hold with the brakes until he could recouple the train, move it out of the way, and then return with the motor for the loaded cars; but he was unable to uncouple this car from the west side. He then attempted to separate the train from the opposite side, and went, for that purpose, to the corner of the empty car north of the point where it had been struck. This car had a Tower automatic coupled with a knuckle, which, when closed, was held in place by a pawl, to which was attached a short iron rod with an eye at each end, connected at the top with a chain that extended upward and was fastened to an iron arm. This arm reached back to the center of the car's end, to which it was attached, and at this point was bent at a right angle horizontally, so as to extend along the framework of the car to a point near the corner, where it was again bent and turned downward, making a lever, the lifting of which raised the pawl and released the knuckle, thus avoiding the necessity of a person going between the cars to couple or uncouple them. The Tower coupler has a spring in the draw-head that keeps the pawl in position, and prevents it from being raised until the cars are forced together, releasing the tension, when the lever can be raised and the knuckle opened. The plaintiff, standing on the east side of the track, grasped with his right hand the lever at the corner of the third car, and gave with his left hand a signal to force the train slowly to the south, so as to slacken the strain, and the motorman, obeying the token, pushed the cars in that direction, but the plaintiff, being unable to raise the lever or to release his hand therefrom, was pulled the intervening distance of about four feet until his body struck the corner of the loaded car, behind which his arm was drawn and injured, necessitating amputation at the shoulder. A small model of the Tower coupler was introduced in evidence, and has been sent up as an exhibit. An examination of this model

shows that the upper eye of the iron rod or pin which is fastened to the pawl has connected therewith two links of a miniature chain and a tiny clevis that completes the connection with the iron arm which forms a part of the lever. A chain containing three constituent parts above the draw-head, namely, two links and a clevis, of relative proportions to that of the pattern before us, is of such length that, when the iron arm commences to raise the pawl, the lower end of the lever by which it is operated stands out at a sufficient angle from the corner of the car as to prevent one's hand from being caught by any counter pressure on the lever. As the chain is shortened, however, the lower end of the lever is necessarily brought down closer to the car, and, if sufficiently reduced, will strike the framework.

The plaintiff, as a witness in his own behalf, testified that it was necessary to force the cars back from six inches to two feet, so that the train could be uncoupled; that the chain on the Tower coupler at the north end of the third car, as it then stood on the track, had been repaired and consisted of only two constituent parts, one of which was a short, round, cold-shut link; that when he took hold of the lever, and gave the signal slowly to slacken the tension, the movement of the train caused the lever to tighten and caught his hand so that he could not withdraw it, and that such retention could not have occurred if the chain had been of the regulation length; that, when the train was started, he partially stumbled, and was unable, with his left hand, to give a signal to check the motion, but when his arm was struck he hollowed and the motorman halted; and that in the few seconds after his hand was caught, and before his arm was injured, he for the first time noticed the defect in the chain. The plaintiff further testified that the empty cars which he tried to uncouple must have been brought into the yard the day before he was injured; that, upon the arrival of a train at such place, the cars are supposed to

be inspected, and, when no "Bad order" tag appears on
them, they are supposed to be in good condition, and that
no mark of that kind was displayed on the car mentioned;
that the distance of about four feet between the corner
of such car and the corner of the car causing the collision
afforded ample space for uncoupling, and, if his hand had
not been caught in the lever, he could have separated the
train on the east side as well as from the opposite edge;
and that, when he first tried to uncouple the car from
the west side, he could see that the collision was tipping
the empty cars off the track towards him, and for that
reason he went to the east side to disconnect the train.

A. A. Benjamin testified that on the day of the injury
he was employed by the defendant as a brakeman in
the yard, and was stationed by the plaintiff on the loaded
cars when they were "kicked" back on the main line, and
that he set the brakes on these cars as hard as he could,
but the friction was insufficient to retain them where they
were left, and they rolled north, and collided with the
empty cars that were then being moved over the switch.

1. The testimony fails to disclose any particular defect
in the brakes on the loaded cars. As the mere happening
of an accident is ordinarily insufficient to establish care-
lessness (*Duntley* v. *Inman*, 42 Or. 334: 70 Pac. 529: 59
L. R. A. 785), that part of the complaint which alleges
negligence in placing in the train, without inspection,
cars upon which were defective brakes, will not receive
any attention.

2. It was incumbent upon the defendant to exercise
diligence to furnish to its servants reasonably safe ap-
pliances, and, in the absence of any notice thereof, the
plaintiff had the right to assume that this duty had been
fully discharged by the master: *Johnston* v. *Oregon Short
Line Ry. Co.* 23 Or. 94 (31 Pac. 283) ; *Geldard* v. *Mar-
shall*, 43 Or. 438 (73 Pac. 330) ; *Texas & Pac. Ry. Co.* v.
*Archibald*, 170 U. S. 665 (18 Sup. Ct. 777: 42 L. Ed.
1188).

3. To promote the safety of its servants, a railroad company is obliged to keep its appliances in good and safe condition, and to cause as frequent and thorough inspection of its instrumentalities as can be done consistently with the conduct of its business, for the purpose of discovering any defects that may occur from accidental causes, the general effect of wear, or the progress of decay: *Miller* v. *Southern Pac. Co.* 20 Or. 285 (26 Pac. 70).

4. "The duty of a master," says a text-writer, "to furnish reasonably safe premises, machinery, tools, and appliances with or about which his servants are to work necessarily implies and includes the duty of making a reasonable inspection of such premises, machinery, tools, and appliances after they have become defective and have been repaired, to the end of seeing that the reparation makes them reasonably safe and sufficient": 4 Thomp. Law Corp. § 3788. The use of the cold-shut link tends to show that the chain had been repaired, and the mending had made it too short. The day prior to the injury the car having the defective chain was brought into the yard where inspection was expected to have been made. The defendant was thus afforded an opportunity, at the proper place, to examine the repairs that had been made, and, if that duty had been discharged, it would have discovered that the chain was too short. The defect in the chain was patent, and might have been discovered by the defendant by the exercise of reasonable and ordinary diligence, in which case notice of the imperfection will be presumed: 7 Am. & Eng. Ency. Law (2 ed.), 1056; 6 Cur. Law, 545; *Belt Ry. Co.* v. *Confrey,* 111 Ill. App. 473; *Doyle* v. *Hawkins,* 34 Ind. App. 514 (73 N. E. 200).

5. The plaintiff having testified that the train should have been moved from six inches to two feet, in order to relieve the tension on the springs in the draw-heads, the space of four feet in which he was required to uncouple before a collision with the loaded car could have occurred, was not so short that the court could, as a

matter of law, determine that it afforded conclusive evidence of contributory negligence so as to take the cause from the jury. So, too, the fact that the empty cars were lifted from the east track by the collision, and the possibility of their being overturned to the west, on which side the plaintiff first tried to uncouple, thereby inducing him, as he testified, to undertake a separation of the train from the other side, is not such evidence of contributory negligence, in view of the danger of the empty cars being thrown off the track to the west, to afford evidence of contributory negligence.

6. It is generally held that a servant who unnecessarily adopts a dangerous method of performing the labor required of him assumes the resulting danger: 6 Cur. Law, 578. His choice of a customary method of doing such work, however, is not ordinarily regarded as negligent: 6 Cur. Law, 584. The plaintiff, on cross-examination, in explaining his reason for going to the east side of the train to detach the cars, after his effort to uncouple the train on the west side had failed, said: "Well, the cars would not pull out. They were contact here on these corners, so the wheels started to raise off of the track on this flat car; so I didn't want to put them any farther. So I come over this car here, and had plenty of space here to pull this lever over and uncouple them here and back up, and I was on the right side, as any railroad man, to go and get the pole out of the door of the motor." It is fairly to be inferred from the latter part of the declaration quoted that the plaintiff chose the customary method of performing the service required under the conditions then existing.

7. Believing that the jury might reasonably have found from the testimony given that the chain attached to the coupler was too short; that it was insufficient for the strains that ordinarily might be expected; that, if the defendant had exercised reasonable care in inspecting its condition after having been repaired, the defect would

have been discovered, and the injuries could reasonably have been foreseen and guarded against; and that the plaintiff had no knowledge of the imperfection—an error was committed in granting the nonsuit.

The judgment will therefore be reversed, and the cause remanded for a new trial.     REVERSED.

---

Decided December 17, rehearing denied April 28, 1908.